# Hogarth *v.* William H. Grundy & Company, Appellant.

*Negligence—Woolen mills—Machinery—Set-screws — Guards — Act of May 2, 1905, P. L. 352—Release—Procurement by fraud— Retention of money—Contributory negligence—Case for jury.*

1. The provision of the Act of May 2, 1905, P. L. 352, requiring, inter alia, that all set screws and machinery of every description be properly guarded, applies to set screws on standing as well as revolving machinery.

2. In an action by an employee against a woolen manufacturing company to recover for the loss of an arm while engaged in work at a wool washing machine, where it appeared that plaintiff's sleeve was caught in an unguarded set screw and his hand and arm were drawn into the rollers, whereby the injury complained of resulted, the question whether it was practicable to guard the set screw or rollers was for the jury and a verdict and judgment for plaintiff will be sustained, where the evidence was conflicting.

3. In such case there was no merit in the contention that the set screw was not the cause of the accident where plaintiff testified that as he was putting the end of the burlapping material with which the rollers were wrapped down between them his sleeve was caught in the screw so firmly that he could not move his arm and it was drawn into the rollers.

4. The question whether defendant was guilty of contributory negligence in not standing on the floor instead of the brake rod when attempting to wrap the roller, and in inserting his hand above instead of below the rod in front of the rollers, was for the jury where plaintiff testified that by reason of his dimunitive height he was compelled to stand on the rod to perform the services, and that he was obeying the directions of defendant's foreman when he inserted his hand above the rod.

5. The question whether a release, alleged to have been executed by the plaintiff a month after the injury, was valid or procured by fraud, was for the jury where plaintiff's evidence was that representatives of the defendant called at his home at a time when he was suffering intensely from the effect of the amputation of his arm, that he was given $200 by one of the defendant's representatives who stated "this is a present......to help you out of expenses because......you need it," and that plaintiff regarded the money as a gift and did not recall signing the release.

6. In such case there was no merit in the contention that the re-

452 HOGARTH *v.* WM. H. GRUNDY & CO., Appellant.

Syllabus—Arguments.          [256 Pa.

tention of the money received from the defendant by the plaintiff barred his right of recovery, since 'a finding that the plaintiff was deceived into accepting the money by a falsehood or fraud negatives the existence of a consideration for the contract and consequently raises no obligation on plaintiff's part to return the money.

Argued Jan. 16, 1917. Appeal, No. 216, Jan. T., 1916, by defendant, from judgment of C. P. No. 3, Philadelphia Co., June T., 1915, No. 4198, on verdict for plaintiff in case of Maxwell Hogarth v. Joseph R. Grundy, trading as William H. Grundy & Company. Before BROWN, C. J., MESTREZAT, POTTER, STEWART and FRAZER, JJ. Affirmed.

Trespass for personal injuries. Before MCMICHAEL, P. J.

The facts appear by the opinion of the Supreme Court.

Verdict for plaintiff for $2,500 and judgment thereon. Defendant appealed.

*Error assigned,* among others, was in refusing defendant's motion for judgment n. o. v.

*Henry Spalding,* of *Fell & Spalding,* for appellant.— There was no evidence from which the jury should have been allowed to find that the defendant was negligent: Wagner v. Standard Sanitary Mfg. Co., 244 Pa. 310; Shannon v. Carnegie Steel Co., 244 Pa. 346; McLean v. A. Schoenhut Co., 225 Pa. 100; Rodell v. Adams, 231 Pa. 284; Clark v. A. Garrison Foundry Co., 219 Pa. 426. There was no evidence that the set screw caused plaintiff's injury.

There was no evidence that the set screw could have been practicably guarded.

Plaintiff was contributorily negligent: Best v. Williamsport Staple Co., 218 Pa. 202; Solt v. Williamsport Radiator Co., 231 Pa. 585; Snyder v. Longmeade Iron Co., 244 Pa. 325; Carll v. Brown, 251 Pa. 273; Card v. Stowers Packing & Provision Co., 253 Pa. 575.

The release was binding and the court should have so ruled as a matter of law; it cannot be set aside unless the evidence attacking it is clear, precise, satisfactory and indubitable: DeDouglas v. Union Traction Co., 198 Pa. 430.

*Hugh Roberts,* for appellee.—Where the evidence is conflicting on the subject of necessity and practicability of guarding machinery, such questions are for the jury: Harner v. F. H. White Co., 246 Pa. 402; Sparrow v. Scranton Bolt & Nut Co., 253 Pa. 116; Fortney v. Breon, 245 Pa. 47; Shannon v. Carnegie Steel Co., 244 Pa. 346.

The question of the validity of the release was for the jury: Gordon v. Great Atlantic & Pacific Tea Co., 243 Pa. 330; Clayton v. Consolidated Traction Co., 204 Pa. 536; Ettinger v. Jones, 139 Pa. 218; Spritzer v. Penna. R. R. Co., 226 Pa. 166; Gibson v. Western N. Y. & Penna. R. R. Co., 164 Pa. 142; Vanormer v. Osborne Machine Co., 255 Pa. 47.

OPINION BY MR. JUSTICE MESTREZAT, February 12, 1917:

This is an action of trespass to recover damages for injuries which the plaintiff alleges he sustained by reason of the defendant's negligence.

The following facts appear in the defendant's history of the case: The defendant owned and operated a woolen mill in the City of Bristol, Pennsylvania, in which the plaintiff was employed on September 14, 1914. He worked on a machine constructed and operated on the principle of the ordinary domestic clothes-wringer. After passing through a wash of soap and water, the wool passes between two rollers which squeeze out the water. The upper roller is fourteen inches in diameter, and the lower roller is nine inches in diameter. These rollers meet or mesh at a point forty-one inches from the floor. In order to keep the steel of the rollers from coming in contact with or cutting the wool which

passes through them, they are kept wrapped with a wool rope called "lapping wool." Before going through the rollers the wool is passed over a guide bar, which runs parallel with the face of the rollers and is one and one-half inches in front of the upper roller and four and one-half inches above the point where they meet. A brake rod extends along the side of the machine and parallel with and sixteen inches above the floor. It connects two levers which are used in controlling the machine. It was part of the plaintiff's duties to re-wrap the rollers when the necessity arose. While he was standing on the brake rod and was beginning to wrap the lapping wool about the roller, his hand was drawn between the rollers and seriously injured, resulting in the subsequent amputation of his arm. He alleges that his coat sleeve caught on a projecting set screw which adjusted a guide bar on which are guide forks used to keep the wool within the flanges of the rollers, and that by reason of the sleeve catching on the set screw his hand was drawn between the rollers. The negligence alleged was the failure to guard the machine and rollers as required by the Act of May 2, 1905, P. L. 352. The case was submitted to the jury, and a verdict was returned for the plaintiff. The court refused to enter judgment for the defendant non obstante veredicto, and, judgment having been entered on the verdict, the defendant has taken this appeal. The only assignment of error is the refusal of the court to enter judgment for the defendant.

The Act of 1905 provides (Sec. 11), inter alia, that "all......set screws......and machinery of every description shall be properly guarded." The plaintiff's statement avers "that said machine and rollers were not properly guarded and safeguarded as required by law and the same and the appliances about the same were out of repair and were in a dangerous, unsafe and defective condition." This is the negligence complained of and which, the plaintiff alleges, resulted in his injuries. The defendant denied the right of the plaintiff to recover for

three reasons: (a) There was no evidence that the defendant was negligent, (b) the evidence clearly showed that the plaintiff was so grossly guilty of contributory negligence that the court should have ruled as a matter of law that his recovery was barred, and (c) the defendant executed a release. These questions were all submitted to the jury in a most elaborate charge to which no error has been assigned. Neither is error charged to the admission or rejection of any evidence offered in the case. A careful examination of the evidence and the legal questions involved fails to convince us that the court erred in declining to enter judgment for the defendant.

We think the evidence was sufficient to justify the court in submitting to the jury the question of the defendant's negligence. The averment in the statement is sufficiently comprehensive to include the failure to guard the set screw. It is conceded that the screw was not guarded, but the defendant claims that the Act of 1905 applies only to set screws in revolving machinery. The answer to that contention is found in the act itself which requires all set screws to be properly guarded. The act makes no distinction between set screws in stationary or revolving machinery. The present case is a good illustration of the danger of set screws in stationary machinery. The jury was fully warranted in giving credence to the plaintiff's story that his injuries resulted from his coat sleeve being caught in the set screw which prevented him from withdrawing his hand from the rollers.

It is contended by the defendant that, under the undisputed testimony, it was not practicable to guard the set screws or rollers, and that the court, therefore, should have ruled as a matter of law that the defendant was not negligent in failing to guard them. It is true that the defendant called three witnesses who testified that rollers on machines of this character could not be guarded and the machine operated. This testimony, however,

was opposed by testimony on the part of the plaintiff tending to show that it was practicable to guard machinery of this kind. The plaintiff himself testified that he had seen set screws guarded, and that flush set screws were called "guarded" set screws. He testified to instances where he had observed the guarded screw. Another witness was called by the plaintiff who testified that "the only thing I can say to that set screw, it is not guarded properly." He also testified that it was customary to put counter-sunk set screws in machinery and that a projecting set screw is not now put in any kind of machinery because it is dangerous. He said that he had seen guards over set screws at some of the large manufactories in this vicinity. He described how the guard was put over the screw so as to protect the clothes or body of a person coming in contact with it. There was other testimony tending to show the danger from unguarded set screws, the necessity for guarding them, and that it was practicable to guard them. It is apparent, therefore, that it was for the jury and not for the court to determine whether it was practicable to guard the set screw in question.

There is no ground for the defendant's contention that the set screw did not cause or contribute to the plaintiff's injury or was not, in any way, the cause of his hand being caught in the rollers. The plaintiff testified positively that the sleeve of his coat was caught on the screw and prevented him from withdrawing his hand from the rollers and extricating it after it was caught by the rollers. He said: "Q. Caught on what? A. On this set screw. And I could not get my hand either way at all, and it forced my hand in, and it was forcing my hand in all the time, and when I gave the first holler the man at the front stopped the machine off. ......Q. How did the accident happen? A. As I was putting my arm with the end of the burlaping down between the rollers, in between the guide bar, my shirt sleeve caught on the set screw, and it fastened it tight

there and I could not move it.   Q. What do you mean
when you say it fastened it tight?   A. I could not get my
arm away to get it away, and it drawed my arm under
the roller."   In other words, the set screw was the sole
cause of his hand being drawn into and crushed by the
rollers.

It is claimed by the defendant that the plaintiff's in-
juries resulted from his own negligence in not standing
on the floor instead of the brake rod while attempting to
wrap the roller and by inserting his hand above instead
of below the rod in front of the rollers.   The plaintiff
denies that either of these acts was negligent, and al-
leges that by reason of his diminutive height he was com-
pelled to stand on the rod to perform the service and that
he was obeying the instructions of the defendant's fore-
man when he inserted his hand above the rod.   He also
contends that he was performing this service in the usual
and customary way.   We have examined the testimony
bearing on this branch of the case and are not convinced
that it so clearly supports the contention of the defend-
ant that the court could have so declared as a matter of
law; on the contrary, we think it warrants the conclu-
sion of the jury that the acts complained of by the de-
fendant were not negligent and did not contribute to the
plaintiff's injuries.

The accident resulting in the plaintiff's injuries oc-
curred on the evening of September 14, 1914.   Hogarth's
arm was crushed and subsequently amputated.   The
operation was performed in the hospital on September
20th.   Three days thereafter and while Hogarth was in
very poor physical condition, Joseph P. Hill, the lia-
bility adjuster of the defendant, called at the hospital to
discuss terms of settlement.   At this time Hill procured
from Hogarth a statement as to the manner in which
the accident occurred.   Hogarth signed the statement
by his mark, and it is witnessed by Hill.   The latter saw
Hogarth again before he left the hospital.   On October
13th, less than a month after the man was injured and

while he was still in a suffering condition, Hill called at his residence with one Arensmeyer, defendant's superintendent, and procured a release which is in the form usually taken under such circumstances and states that it is in "full accord and satisfaction of a disputed claim growing out of bodily injury......for which injury I have claimed the William H. Grundy Company to be legally liable, which liability is expressly denied," and releasing and discharging Grundy & Company from all claims by reason of any injury or suffering which Hogarth had sustained or which thereafter he might sustain by reason of the accident. The consideration named in the release is $200. The signature of the plaintiff to the writing was witnessed by the defendant's two employees who called on Hogarth. This release was offered in evidence, and it is now claimed by the defendant's counsel that it is binding on the plaintiff and bars a recovery in this action. Hill testified that he called on the plaintiff on the morning of the day in question and they discussed a settlement but they disagreed as to terms. Hill returned to the defendant's mill and, in the afternoon, he, accompanied by Arensmeyer, went to the plaintiff's home. They testified that Hill offered the plaintiff $200 in settlement of his claim for damages, and he accepted the money. Hill testified that he then filled in the release, read it to the plaintiff, handed it to him, and then gave him the $200. The plaintiff read and signed the release by making his mark with his left hand to his signature which was written by Hill. The latter further testified that he placed a red seal on the release before it was signed. Arensmeyer substantially corroborated Hill except that he did not see the seal on the paper.

The plaintiff and his wife tell a different story from that told by the defendant's liability adjuster and assistant superintendent. Hogarth testifies that Hill called on him at the hospital on September 23d, and he told the latter he was then suffering great pain. Hill did

not make known to the plaintiff who he was, and the plaintiff did not know him. Hogarth says he has no recollection of signing the statement on September 23d, witnessed by Hill and produced by him at the trial. He denies that any such paper was read to him at the time it purports to have been signed. He testifies that when Hill called at his home on the morning of October 13th he was in a bad condition, and had been lying on a couch all morning. Hill was admitted to the house by the plaintiff's wife. After he had entered, he asked the plaintiff how he was and was told that he felt very badly. Hill told the plaintiff that he had just come from the defendant's office on a little matter of business, and the plaintiff replied that he, the plaintiff, did not know anything about any business and did not transact business with anybody. Hill said Mr. Leach was going to give the plaintiff a little money to help him out of his expenses. The plaintiff says that is all that he remembers of what occurred on that occasion. The plaintiff testifies that Hill and Arensmeyer returned after dinner that day, that Hill took some money from his pocket and put it on the table but did not tell the plaintiff how much it was. He told the plaintiff to count it, but the latter was unable to do so accurately. Hill then said to him: "This is a present that Mr. Leach is giving to you to help you out of expenses, because he says that he knows you need it." Hogarth says that he does not remember making his mark to any paper on that occasion, that he did not give his consent to putting a red seal on the paper, and that he never saw the paper before it was shown to him in court. He denies that Hill came to the house to see him about a settlement of the case. Mrs. Hogarth testifies that she saw Hill at the hospital, but he seemed to say nothing except to ask her husband about his arm. She was at home when Hill called to see her husband on the morning of October 13th. He then asked Hogarth about his arm and how many children he had. Mrs. Hogarth was going between the two adjacent rooms, the door re-

maining open, while Hill was there and says she heard
nothing said about a settlement. Hogarth was sick, she
states, was up and down, and was suffering pain. She
says that Hill called with Arensmeyer in the afternoon
and put $200 on the table. Hill said: "Here is a small
sum, Mr. Leach had sent it to help us along until my hus-
band got able enough to work." She then inquired if
Hogarth's work was all right, to which Hill replied that
it was. She told Hill when he first came to the house
that her husband was not in a fit condition to talk busi-
ness of any kind. She says she did not see her husband
put a red seal on the paper, nor did she see any person
offer to give him a pen and ink to sign a paper. She
heard nothing about a settlement of the case. She as-
serts positively that she understood the $200 to be a pres-
ent to assist the family until her husband was able to
work, and that she inquired about whether Hogarth's
work was all right because she was anxious that he re-
sume his work with the defendant as soon as he was
able.

We have given substantially the material part of the
testimony of both parties on this branch of the case, and
it is clear, we think, that the learned court was right in
submitting it to the jury for them to determine whether
the alleged release was procured by fraudulent means
and was, therefore, void. The learned counsel for the
appellant assumes that the purpose of this evidence was
to reform the instrument in question, and that, there-
fore, it must fail of its purpose unless it is clear, precise
and indubitable. We concede if that had been the pur-
pose of the testimony the standard suggested would be
correct in a case to which the principle is applicable.
This is shown by the numerous authorities cited in the
appellant's paper book. The plaintiff here, however,
does not attempt to reform, alter or contradict the al-
leged release so as to conform to a different state of
facts, but alleges that the release was obtained by mis-
representation and fraud, that he never executed the re-

lease knowing it to be such, that the paper was not read
to him, and that the defendant's agent told him the
money was given him to help pay expenses until he could
resume his work. The question, therefore, was, not
whether the release should be reformed and whether the
evidence submitted was sufficient for the purpose, but
whether the paper was procured by fraud and, therefore,
was of no binding force on plaintiff. This was the issue
raised by the release, and the evidence was sufficient to
warrant its submission to the jury and, if believed by
them, to sustain the finding that the paper was fraudu-
lently obtained. We have referred above to the testi-
mony and need not repeat it here. It shows Hill's ac-
tivity in pursuing the plaintiff to obtain a settlement
from the time the latter was injured until the release
was obtained. Hill's first visit to the plaintiff was in
the hospital three days after his arm was amputated, and
the last call was made at the plaintiff's home less than
a month after the plaintiff was injured. During all this
time, according to the testimony which was believed by
the jury, the plaintiff was suffering from the amputation
of his arm. When Hill called the last time and obtained
the paper, Mrs. Hogarth told him, prior to his conversa-
tion with her husband, that he was not in a condition to
talk business of any kind. The jury evidently believed
this to be correct, in view of the claim that plaintiff
agreed to accept $200, the sum named in the release, as
the value of his right arm. Under the facts developed
by the testimony, the validity of the release was clearly
for the jury: Ettinger v. Jones, 139 Pa. 218; Gibson v.
Western N. Y. & Penna. R. R. Co., 164 Pa. 142; Julius
v. Pittsburgh, Allegheny & Manchester Traction Co.,
184 Pa. 19; Clayton v. Consolidated Traction Co., 204
Pa. 536; Gordon v. Great Atlantic & Pacific Tea Co., 243
Pa. 330; Vanormer v. Osborne Machine Co., 255 Pa. 47.
. There is no merit in the contention that the retention
of the money received from the defendant by the plain-
tiff barred his right of recovery. As the jury has found

that the plaintiff was deceived into accepting the money by a falsehood or fraud, there is no admission that it was a consideration for a contract, and there is, consequently, no obligation on him to return it: Gibson v. Western N. Y. & Penna. R. R. Co., 164 Pa. 142, 155.

The judgment is affirmed.